Good morning. I'm Ron Salon from the City Attorney's Office in Henderson, Nevada, representing the City of Henderson and Officer Jeffrey Blott. The fundamental flaw, as I see it in the district court's holding, is that it was mistaken as to the point in time that an officer's reasonable suspicion should be evaluated. And from that mistaken premise came, frankly, a mistaken analysis. The analysis should have been this. Objectively speaking, from the point in time that a Fourth Amendment seizure actually took place, looking at the totality of circumstances, all of them, not in isolation from one another, but the whole record, and giving due weight to Officer Blott's training and experience and the inferences he made, did Officer Blott have, at a very minimum, arguable, reasonable suspicion for the stop? Now, it does not matter what Officer Blott may have subjectively thought. It doesn't matter what Terry Anderson subjectively thought after speaking to Officer Blott. It doesn't matter what level of suspicion Officer Blott may have had at the point in time that he made the initial decision to get behind the U-Haul truck. As a matter of fact, one of the cases I cited on page 33 of the brief is called U.S. v. Hill from the Sixth Circuit, 195-3258. And in that case, the officer testified that the only reason that he had gotten behind the vehicle was for no other reason than it was a U-Haul truck, and that was certainly okay. Then the officer later observed a speeding violation, and so the stop was validated. It doesn't make any difference what level of suspicion Officer Blott had at various points prior to the stop.  points prior to the stop. It doesn't make any difference what level of suspicion Officer Blott had at various points prior to the time that a Fourth Amendment seizure actually took place. What's the justification for the felony stop? For the felony stop? Well, there were a number of reasons for the felony stop, reasons that the appellees haven't really brought into question, but I would point out that some of the cases I've cited would more. No, I'm in the record here. What was about the circumstances that justified a felony stop? Okay. Well, first of all, there are a number of factors that a court would use to determine whether a felony stop is an appropriate thing to do. And in looking at that, the court would look at a number of circumstances. For example, in Haney v. Los Angeles. I think Judge Baez is asking about this case, so why don't you talk about the factors in this case that you think justified the felony stop? I'm not talking about in the abstract. I'm talking about the facts in this case. Okay. So when looking at what factors would convert a normal Terry stop into an arrest by use of handcuffs and a shovel? Well, let's just say, for purposes of discussion, that there was a failure to stop with the one after he turned on his emergency lights. Yes. That would certainly be a factor. Okay. And there are a number of other factors. Okay. So let's just assume that there was probable cause or reasonable suspicion to stop him. My question is, what were the facts, what were the circumstances that justified the felony stop? That is, pulling him out of the car, putting him on, making him get down on his knees and raise his hands or put his hands behind his back, exactly what happened. Right. What was it that justified that? That's all I'm trying to find out. Okay. Well, there were a number of factors that raised Officer Bott's concerns. For example, one of them being that the vehicle did, in Officer Bott's mind, fail to yield. And that, I've cited a number of cases that say that this is a very significant factor in determining whether a show of force and use of handcuffs is appropriate. And I've cited a number of cases saying that. Aside from the cases I did cite, there are plenty of others. One of them is United States v. Bravo, 295 Fed Third 1002. But certainly the fact that the vehicle failed to yield is recognized by a number of decisions to be a very important factor in raising the officer's safety concerns as to what this U-Haul is doing. Now, here there are a number of other factors as well. One is that, you know, here the officer gets behind the U-Haul, puts on his lights, pulls in his own lane to the left of his own lane to be sure that the driver of the U-Haul can see him. The U-Haul does not yield. He then turns on his red lights. Other traffic does yield. The U-Haul does not yield. This does raise the safety concern. And, again, there are many cases that I have cited in my brief that talk about how enormously significant that is in raising the officer's safety concerns. Then, in combination with some of the other observations that the officer had made, this takes on more significance. Now, what this vehicle does is to travel on Boulder Highway in a north and west direction and then make a turn from Boulder Highway onto Russell Road and go completely eastbound. Now, in doing that, the U-Haul passed the intersection of Broadbent and Boulder Highway and had the U-Haul, and this is one of the streets that, again, that the U-Haul had passed with the officer behind him. The U-Haul didn't exit on Broadbent but instead went in a completely north and west direction to reach Russell Road and then proceeded back toward Russell Road and Broadbent. And this is an intersection that the U-Haul could have reached far more quickly and far more directly by simply exiting Broadbent and go straight in a north and completely east, completely to the east direction, to reach that security. So the securitist route that the U-Haul taken, and a number of cases discussed the legal significance. Let me take this one step further, because I want you to address this one question before your time runs out. What about the passengers? What was the justification for treating them in the way the officer did? Okay. He ordered them out of the car. What happens is then this truck, first of all, does a number of observations prior to this stop actually taking place that, again, elevate the officer's safety concerns. And I'm going to reach the point about the passengers, but I just think it's important to point out that this U-Haul goes eastbound on Russell Road and then stops unexpectedly in the middle of the street where there's no stop sign. The officer actually has to hit his brakes in order to maintain a safe distance behind the U-Haul. They're in the most remote, desolate, poorly lit area that the U-Haul possibly could have located at that time.  It was lost. The officer is outnumbered. He thinks outnumbered and proves to be outnumbered. So he's alone. It's getting dark. He's in a place where it's unsafe. He sees a U-Haul traveling in a direction which presumably ought to be carrying household furnishings in an area that is completely inappropriate to a U-Haul because it is going straight toward Sam Boyd Stadium and dead-ending at Sam Boyd Stadium at a place where there's no activity taking place there. So now the U-Haul stops where it's not supposed to stop, forcing the officer to stop. He then suddenly, abruptly makes a left sharp turn, pulls over again immediately on the right side of the road, kicking up dust behind him. The officer still doesn't know whether at any time this truck is full of people. He doesn't know what actually is taking place and why the U-Haul would be acting in this consistently strange way. I'm not sure you answered the question, though. All of those observations may support some action with respect to the driver, but the question is what about the passengers? Well, he doesn't know whether or not there are passengers. He knows that this is a U-Haul truck that- Well, look, he stopped the vehicle, right? Yes. Everybody got out of the vehicle eventually. Yes. And he then treats the passengers, he handcuffs them and puts them in the car. Yes. What was the justification for that? Had he known who was in the vehicle, perhaps he may have operated differently, but here you have a situation where he doesn't know if this truck is full of people or not. Right, right, but when he stops, Counsel, because your time is running down, I want to make sure that you have an opportunity to answer an important question in this case. When the vehicle is stopped, everyone is taken out, and one of the allegations in this case is that they were seized and detained for an unreasonably long period of time, handcuffed, show of force with a gun, right? That's one of the allegations. So after the vehicle has been secured, what is the justification for the felony stop of the passengers, particularly in light of the officer's statement that some of the passengers he thought might have been kidnapped. So he's treating the kidnapped victim, supposedly, the same as he would the driver of the car. So tell me what is the independent, what we want you to address is your view of the independent justification, if there is any, for the felony stop of the passengers. Okay. If there is no independent justification, that's fine, and it will rise or fall in your other theory. Okay. Let me talk maybe about some of the cases that I did cite, which on far less justified felony stops. We have a vehicle in one of the cases I cited where the officer suspected nothing more than unpaid parking tickets, but the fact that the vehicle failed to immediately yield was sufficient to raise the officer's suspicions as to exactly what was going on. Counsel, if I might interrupt. The question we're asking is not what cases support the stop in this case. The question is what facts in this case independently justify the stop and arrest, felony arrest or detention of the passengers. And if your answer is it's derivative and that's the end of it, that's your position. But I'm wondering, do you have any independent, is there any independent justification for stopping the passengers? When the officer is dealing with a complete unknown in a remote, desolate, poorly lit area, has no idea how many people are in the vehicle, and by the way, this was not an unlengthy stop, given the dispatch records showing exactly how long this took place. This was done with quick dispatch. They simply pulled the occupants out so that they could determine who was in the vehicle. Once that was done, they immediately ran the names, and I think that the amount of minutes here was like from 8.04 p.m. to like 8.20 p.m. They had completely run all of the names, satisfied themselves that there really was not a problem, their fears were allayed, and they immediately released these passengers. Now, I think your answer is there's no independent justification for stopping that's derivative of the suspicion concerning the driver and the vehicle. Is that your answer? Well, the suspicion didn't necessarily flow. In the officer's mind, given the series of unusual driving behaviors, the officer didn't know if he should be concerned only about the driver or if he should be concerned about a truck full of people. Did the passengers do anything that justified the stop independent of the driver or the vehicle? Or did they do anything independently at the car, at the scene, that justified pulling the gun, handcuffing, et cetera? That's the only question. You're taking a long time to answer, I think. We're just trying to get your position on that. We're not quarreling with you or trying to debate the precedents that may fall one way or the other. We're just asking, is there anything in this record that provides independent justification? But that question, in my mind, assumes that he knew that there were passengers or how many passengers. You know, I think we're not getting anywhere, and I'm sorry we're not communicating. But I gather from your answer there's nothing else in the record to which you can point. For example, if a passenger, in these cases, a passenger makes a sudden movement, looks like he's going to pull a gun. A passenger has a suspicious package. A passenger does something else. No. I gather in this case. We don't have anything like that. Yeah. I didn't mean to get animated with you, but I think you were misinterpreting what we were trying to ask. Yeah. Yeah. Okay. We take your other points. Your time has expired, and we'll hear from the other side. Thank you. Roberts. Counsel, and please, the Court. My name is Robert Langford. I'm the attorney for the plaintiff, Appellee's, in this case. I practice primarily criminal defense, so I'm happy to be here in a fact situation where there wasn't 50 pounds of marijuana in the back of the U-Haul. And my point is, is that so often when we engage in a discussion of Fourth Amendment violations, we end up having a fact pattern where at the end of the story, illegal immigrants are pulled out of the back of the U-Haul trailer, or there are kilos of cocaine, or some other egregious criminal activity has actually ended up taking place. That is not the case here. This is a family that is new to Las Vegas, that is driving around in an area trying to find where they're supposed to be, and this is exactly, exactly the type of people that this Court sought to protect in the Ballesteros ruling. We're citing Rodriguez. This Court said, we are not going to — for this reason, we must not accept what has come to appear to be prefabricated or recycled profile of suspicious behavior very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on a hunch. What's the gist of the Fourth Amendment violation that the plaintiffs have claimed here, that the stop was not justified? Yes. Is that it? Yes, that there was no justification for this stop based upon the words of Officer Bott to my client, where he said, you were driving a U-Haul with Arizona plates in a known drug area. Further, you had a female and child in the front seat, and you looked suspicious. Well, let's assume for the sake of argument that there was an illegal lane change and an arguably illegal lengthy stop at an unmarked intersection, wouldn't that justify a stop? Again, in order to assume those things, and I'm not trying to dodge the question but — Okay. Just assume it's a hypothetical question. Perhaps. I would say perhaps there is a problem. But again, in order to assume those things, we end up having to accept the testimony of Officer Bott alone, because that wasn't conceded by the Court. Well, there's no dispute that Officer Bott turned on his emergency lights. There is no dispute, only because it's difficult for us to dispute that. We didn't see it. We stipulated to it. Well, I mean, what are we going to say, that mechanically there was a problem? I think the stipulation is mechanically there was no problem. We didn't see it, and that's the stipulation. It's impossible for us at that point, then, to say that we can't. So we did stipulate. Well, it just seems to me if, in fact, there had been a different circumstance, there had been cocaine in the U-Haul, there had been a number of illegal immigrants, I seriously question whether that evidence would have been suppressed. I think under Biasteros it would have. No, it's a close — I think you certainly make the argument that the stop itself was not enough. And, again, you end up with the aspect of the lane change and all of that, that comes out articulated. That's the articulated suspicion long after this case has been filed. And that was not what the officer said at the scene. And, again, as a trial lawyer, when I have someone take the stand and they tell me a different story than something they originally told the police years earlier, I mean, the standard thing to say is, well, you said this at the time of the incident, didn't you? Wouldn't you agree with me that you were probably relaying more accurately what took place then than you are now? I mean, it's — Well, let's assume for the — this goes to trial and the jury makes the finding that there was an illegal lane change. Then that's a different circumstance, isn't it? Yes. I mean, again, but they would then at that point — Your best case scenario — not best case, but I think your argument is those are disputed issues of fact that need resolution. And if we assume them at this point, you may have different outcomes, but you can't assume them. Is that the gist of your position on that? Absolutely. The position is that that's a disputed fact, it's a material fact, and it's something that I think a jury needs to decide. I think the difficulty here is that there is testimony that there was an illegal lane change. Your rebuttal of that is the explanation at the scene, which is disputed. But it is undisputed that the siren was on and there was a failure to yield, which — But again, that is — he's initiating the stop at that point without any reasonable suspicion to initiate the stop. I mean, you know, can you turn on the lights just willy-nilly and if somebody doesn't pull over, then you bootstrapped in the ability to make that stop because you turned your lights on and they didn't stop? And the other thing I would say with regards to the lane change — What you're saying is he can't turn on his lights unless he has reasonable suspicion to turn them on? Or some other reason to engage the emergency lights. And I know there are all sorts of procedure as to when it is appropriate to turn on the emergency lights and sirens. But my — my point is that in accepting the illegal lane change, again, that goes back to Officer Bott's testimony. On a motion for summary judgment, the facts have to be assumed in the light most favorable to the police. At that point, then, it is the testimony of Mr. Anderson with regards to what Officer Bott told him at the time of the stop about the reasons for the stop. Did your client ever say he didn't go across three — did your client ever say under oath that he didn't go across three lanes? I don't think he did. My recollection is he — I did not personally do the deposition, and I don't recall that he did. The plaintiffs in their complaint did not contend that the stop or the encounter violated the Fourth Amendment because it was unduly prolonged. The whole focus was on whether Bott had reasonable suspicion to stop the vehicle in the first instance. Isn't that so? That's correct. That's correct. One other thing I would like to point out is that, quite honestly, if you look at some of the cases cited by defendant, appellant, and you look at the facts, the facts are always much greater factual basis for reasonable suspicion. In fact, in Illinois v. Wardlow, cited by them, the facts were, in fact, articulated by the United States Supreme Court that it was headlong flight that the people were engaged in. In Saussure v. Cass, it was — I'm sorry, in Billington, rather, there were tires squealing. Somebody was nearly — almost didn't avoid a head-on collision, was going 70 in a 30. That is not this situation. That is not the fact pattern here. Finally, the defendant, appellant, relies heavily and wants to really hang his hat on this qualified immunity issue. And I would sum up by saying that in Saussure v. Cass, it was quoted that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. Now, in this case, either Officer Bott was plainly incompetent for stopping a car, a U-Haul, with Arizona plates in a known drug area, or he knowingly violated the law. And I think that that is something that the jury is entitled to listen to based upon that statement to my client. I gather your version of the facts that you contend we should look to in determining whether or not there's qualified immunity here would be the version that was set forth at least succinctly. I realize his deposition was taken, but at least succinctly in his answers to interrogatories? Yes. He gives like a two-and-a-half-page version of what happened. Yes. Okay. Now, assuming that the initial reasonable suspicion was the lane change, and I know you dispute that, but assuming that to be true and assuming that the officer turns on his lights and siren and there's a failure to yield, would you agree then if all those are true that there's a justification for a felony-type stop and a high risk? I would not. I would not. I mean, I understand the legality of a lane change and, you know, sort of the automatic bootstrapping of could he have written a ticket, and if he could, then we're there. But the problem with that is we have sort of a creeping situation here where we end up exactly with this case because of that. He says this lane changed a couple of times without signaling. And therefore, he's then justified in doing a full-blown felony car stop at 730 at night in the middle of the summer with people, with babies. I mean, this woman had a baby in her arms when they pulled her out of the car. I mean, that's the problem with all of this. It becomes a creeping situation where we tell police officers, well, that's okay as long as somewhere down the road you can articulate some kind of reasonable suspicion. And I think that we do our country a disservice if we end up in a situation like that because, again, as this Court pointed out and by Asteros, we can't allow ordinary citizens to be caught up in that sweep of I got a hunch and I'm going to pull you over. And later on, if I need to, I'll say you did an illegal lane change. And so I think that even if all of those things were correct, it wasn't enough for the full-on felony car stop that was engaged in here. Thank you, counsel. Thank you, Your Honors. You used up all of your time on opening, but I'll give you a minute if you'd like to take it for rebuttal. You know, a great deal was made before the district court, which I think was in error, to talk about what level of suspicion Officer Bott had at various points prior to the time that a Fourth Amendment seizure took place. And the district court on the record, and it's in my brief exactly what the district court judge said, he said you had to have a reason to follow after this U-Haul. Well, such a proposition is not the law, and it certainly wasn't clearly established as of July 18, 2001. And, again, one of the cases I cited, United States v. Hill, Sixth Circuit case, specifically said in a case where the officer testified the only reason I even got behind this U-Haul truck to follow him is because it was a U-Haul truck. I wanted to observe it. And then when the U-Haul truck later made a traffic violation, the court was completely fine with that, and there was never an issue as to what level of suspicion an officer has to have in order to make the initial determination to get behind a vehicle and to observe it. So that's what I perceived as the district court's initial mistaken premise, that we were having to justify why it is that the vehicle, the U-Haul decided to follow the vehicle in the first place. And if a reason were needed, I mean, here we have a situation where you have a U-Haul truck going 55 miles an hour there about northbound on Boulder Highway in the furthest lane from the officer who is stationary in the median, and you have that driver testifying in his own words that he turned all the way to his left to look at the officer. The passenger in the vehicle, Tina Lemon, says that Terry Anderson pointed the officer out to her, that she leaned all the way forward, looked to her left to see the officer, and Officer Botch says that this was an unusual kind of response to him. And I've cited all kinds of cases talking about the fact that the officer can have his initial suspicion or at least his initial attention raised. It is a legitimate factor in the reasonable suspicion calculus. Certainly if a reason were needed, that all by itself would be a reason for him to go ahead and get behind the U-Haul. And then what does the U-Haul do? Immediately upon seeing the officer and having two people in the vehicle stare at the officer, immediately switch lanes from the far right lane to the middle lane, back to the far right lane. The officer says he didn't use his turn signal. They say he did. But regardless, I don't think we need to establish a justification for the U-Haul being behind it, but if a justification were needed, the officer had one. But this is grilled into officers' heads to be aware of danger cues. And the officer had a number of danger cues raised here. You have the vehicle going to this area, completely desolate, where the U-Haul is completely inappropriate to the area, which is another factor that the Ninth Circuit has recognized as a legitimate factor to consider. In the U.S. v. Segment Ballesteros case, that is the one and only case that the appellees cite. And we've attached a map to kind of illustrate this. So you have the U-Haul going completely to the north and to the northwest, and to turn eastbound and reach a point that was much easier, much more directly reached by leaving the intersection of Boulder Highway on Broadbent. Counsel, now you're far, far over your time. So I do think we have your facts at hand and appreciate you, your argument today, both of your arguments, and for coming over to San Francisco to argue. So thank you for your arguments. The case will be submitted. Thank you. We'll proceed with the next case on the oral argument calendar, which is Seale v. Seale.
judges: Thomas, Paez, Burns